IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ESTATE OF JIMMY LEE TESTA et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN FALLICK, et al., <br><br> Defendants. | Civil Action <br><br> No. 1:18-CV-15257-KMW-SAK <br><br> **OPINION** |

Kevin T. Flood, Esquire
Solomon M. Radner, Esquire
Conrad J. Benedetto, Esquire

    *Counsel for Plaintiff Debra L. Steven, Individually and as Administrator Ad Prosequendum of the Estate of Jimmy Lee Testa*

Marvin L. Freeman, Esquire
Peter M. Draper, Esquire

    *Counsel for Defendants John Fallick and Nicholas Mueller*

**WILLIAMS, District Judge:**

    **I.   INTRODUCTION**

This matter comes before the Court by way of the Motion for Summary Judgment of Defendants John Fallick and Nicholas Mueller (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 56. Defendants' Motion is opposed by Plaintiff Debra L. Steven ("Plaintiff"), who brings this action both individually and as administrator *ad prosequendum* of

1

the estate of her late son, Jimmy Lee Testa (the "Estate"). For the reasons discussed more fully below, Defendants' Motion for Summary Judgment is granted, in part, and denied, in part.

## II. BACKGROUND

On November 6, 2016, Defendants—both former New Jersey State Troopers—were dispatched to investigate a report of a suspicious person in and/or around an abandoned house in Leesburg, New Jersey. *See* Defs.' Statement of Material Facts ("Defs.' SMF") ¶ 1. After arriving to the scene, Fallick walked around to the back of the house, while Mueller kept watch in the front. *See id.* ¶ 4. As Fallick was inspecting the back of the house, he saw a person—now identified as Jimmy Lee Testa ("Testa")—sitting in the window on the second floor. *See id.* Fallick identified himself and ordered Testa to come down, to which Testa responded, "I can't." *See id.* ¶ 5. After Testa did not come down, Defendants called for backup. *See id.* ¶ 6.

Shortly thereafter, Testa walked down to the first floor of the building. *See id.* ¶ 7. Fallick again ordered Testa to come out, to which Testa again responded, "I can't." *See id.* According to Fallick, at some point Testa began "fiddling" with the door handle of the back door, which led Fallick to draw his gun and kick the door in. *See id.* With his weapon drawn, Fallick saw Testa and orderd him to come out of the house. *See id.* ¶ 8. Testa, however, ran in Fallick's direction toward the back door and managed to escape. *See id.* ¶¶ 8–9.[1] It is undisputed that Testa was not armed.

After Testa escaped through the back door, he led both Defendants on a foot pursuit in and around the backyard of the abandoned house. *See id.* Defendants continued ordering Testa to stop

---

[1] Defendants repeatedly state in their briefings that Testa "charged into Fallick" *See* Defs.' Br. at 3, 14, 18, 21; *see also* Defs.' SMF ¶ 8. However, Fallick's deposition testimony makes clear that Testa never "charged into him," much less make any physical contact with him at all. Rather, Fallick testified that Testa "ran out at [him]" as he was attempting to flee from the back door. Fallick Dep. Tr. at 29:24.

running, though they were eventually able to tackle him to the ground. *See id.* ¶ 12. As Defendants were trying to restrain him, Testa broke free and continued to run on foot.

Defendants pursued Testa across the street and into what was ostensibly a vacant junkyard containing "old lawnmowers, air conditioners, piles of aluminum cans, wagons, gutters, poles, an old vehicle and a number of assorted scrap metal items." *See id.* ¶ 21. Although Fallick tripped and fell at some point along the way, Mueller was able to successfully tackle Testa in the junkyard, with Fallick arriving seconds later to detain Testa. *See id.* ¶¶ 19–21. However, as Defendants were attempting to handcuff Testa, he continued to try to escape—"flailing around," "kicking his feet," and "throwing his arms around" in an "attempt[ ] to get away." *Id.* ¶ 22. When Testa did not comply with Mueller's command to stop resisting and place his hands behind his back, Fallick sprayed Testa in the face with mace. *See id.* ¶ 24. Defendants claim that the mace had no effect on Testa, who continued to try to break free. *See id.* ¶ 25.

Defendants claim that Testa, though still on the ground, persisted in his attempts to break away from Defendants. As a result, Defendants then began delivering "compliance strikes" to Testa's body with their fists and elbows; Testa, however, reportedly continued to resist. *See id.* ¶ 27. Fallick then began delivering a series of "combative strikes" to Testa's abdomen to get him to submit. *See id.* ¶ 28. This too was reportedly unsuccessful, which led Fallick to begin punching Testa in his face and head with his fists. *See id.* ¶ 29. Both Defendants then began striking Testa in the skull repeatedly with their metal flashlights. *See id.* ¶ 35.

When Testa reportedly managed to sit upright on his knees, Fallick placed him in a headlock and forced his body back to the ground. *See id.* ¶¶ 31–32; *see also* Fallick Dep. Tr. at 48:4–15. As Fallick restrained Testa, Mueller was able to place handcuffs around Testa's right wrist. *See* Fallick Dep. Tr. at 47:13–16; *see also* Mueller Dep. Tr. at 13:14–17. As Defendants

attempted to secure his left arm, Testa continued flailing and trying to get away from them. *See* Defs.' SMF ¶ 33. Although Defendants claim that Testa resisted arrest, they do not claim that Testa ever assaulted or attempted to assault them, but was rather attempting to escape. *See id.* ¶¶ 1–35.

"At some point during the altercation," Testa landed on some cylindrical object. *Id.* ¶ 36. Defendants variably describe the object as a "steel galvanized pipe" (ECF No. 81-2 at 7) or a "lead pipe" (ECF No. 91 at 9). A subsequent responder described the object as a "metal, silver, rusty, pipe approximately two to three feet in length." (ECF No. 82-4 at 61). The official crime investigation report instead describes a "large metal pole" that was "measured to be five feet in length." (ECF No. 82-4 at 4). Because the photographic evidence is consistent with the description contained in the crime investigation report, the Court concludes that the purported object involved was likely a five-foot metal pole. (ECF No. 82-4 at 87).

Returning to the facts of the incident, as described by Defendants, Testa had not sought out the pole, but had rather fell on top of it during his struggle with Defendants as they were detaining him. *See* Defs.' SMF ¶ 36. Both Defendants appear to agree that Testa, while still on the ground, began lifting the pole up with his right hand. *See id.* ¶ 39. According to Fallick, Testa, who still had both hands on the ground, managed to come to his knees. *See id.* ¶ 45. Mueller, however, has testified that Testa was not on his knees, but rather on all fours. *See* Mueller Dep. Tr. at 8:20–25.

According to Fallick, as Testa attempted to push up, Fallick was laying on Testa's back, while Mueller was restraining Testa's right arm and the pole, keeping both to the ground. *See* Defs.' SMF ¶ 53. Both Defendants testified that they felt tired and feared that Testa was going to break free. *See id.* ¶¶ 37, 43. They also claim that they were in fear of their lives, purporting their belief that—if Testa broke free—he would kill both of them with the pole. Fearing that they would fail in their efforts to restrain him, Fallick yelled to Mueller to shoot Testa. *See id.* ¶ 48. As Mueller

4

reached for his gun, he claims to have told Testa "if you don't . . . stop right now, you're going to be shot." Mueller Dep. Tr. at 11:7–9. Mueller, however, claims that he was unable to reach his gun because his belt had twisted around his waist and effectively placed his gun along his spine. *See id.* at 9:19–23.

When Mueller did not shoot, Fallick claims that he—while still laying on top of Testa and restraining his left arm—drew his gun with his right hand and shot Testa in the back at close range from a "hip retention position." Defs.' SMF ¶ 55. Mueller, however, claims that Fallick was either sitting or kneeling one to three feet away from Testa. *See* Mueller Dep. Tr. at 10:1–19. Mueller also claims that he does not recall what position Testa was in when he was shot. *See id.* at 10:20–11:1. Both Defendants appear to agree that Testa immediately fell flat on his stomach upon being shot. *See* Defs.' SMF ¶ 56.

The bullet entered Testa's body from the right side of his back and exited on the right side of his neck. *See id.* ¶ 61. Though Defendants handcuffed him after he dropped, Testa was later pronounced dead at the scene. *See id.* ¶ 62. A homicide detective noted in the crime investigation report that the pole "was observed near [Testa's] feet." (ECF No. 82-4 at 81). Based on time logs from the New Jersey State Police radio, it appears that no more than six minutes and seven seconds elapsed between the time that Testa first fled and when Fallick shot him in the back. *See* Defs.' SMF ¶¶ 59–60. Defendants did not report any serious injuries. Mueller testified that he had "just cuts and abrasions on [his] hands," and that his "back was a little tight." Mueller Dep. Tr. at 28:23–25. Fallick testified that his right hand "swelled up" from punching Testa, and that his knee was also swollen from when he fell. Fallick Dep. Tr. at 63:17–21.

5

Plaintiff, Testa's mother, brings this action against Defendants and asserts claims for excessive force and failure to intervene under 42 U.S.C. § 1983, as well as wrongful death and survivorship claims under New Jersey state law.

### III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.''" *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering

a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

IV. **DISCUSSION**

To the extent Plaintiff's claims are premised on 42 U.S.C. § 1983, Defendants seek summary judgment as to (1) claims brought against both of them for excessive force; (2) a single claim brought against Mueller for failing to intervene in the excessive force; (3) and any claim purporting to be brought against Defendants in their "official capacities." Defendants likewise seek summary judgment as to Plaintiff's claim for wrongful death under New Jersey state law. The Court addresses each in turn.

A. **Plaintiff's Excessive Force Claims**

Plaintiff's excessive force claims are premised on 42 U.S.C. § 1983, which "provides a cause of action for any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation marks omitted). "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Curley*, 499 F.3d at 206.

"Qualified immunity shields government actors from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 174 (3d Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). At its core, qualified immunity "is not a mere defense

7

from liability," but is rather "an entitlement not to stand trial or face the other burdens of litigation." *Curley*, 298 F.3d at 277 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (internal quotation marks omitted). "The recognition of a qualified immunity defense . . . reflects an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow*, 457 U.S. at 807. Officers bear the burden of establishing their entitlement to qualified immunity at the summary judgment stage. *See Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021).

To determine whether an officer is entitled to qualified immunity, courts undertake a two-prong inquiry. First, the Court must engage in a constitutional analysis and decide "whether the facts—taken in the light most favorable to the nonmoving party—show that a government official violated a constitutional right." *Santini*, 795 F.3d at 417 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, the Court must consider "whether that right was clearly established at the time of the official's actions." *Id.* "An answer in the negative to either prong entitles an officer to qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021).

The Court begins its analysis with the first prong. In excessive force cases, courts determine whether a constitutional violation has occurred using the Fourth Amendment's "objective reasonableness test." *Santini*, 795 F.3d at 417.[2] To this end, the Court assesses "the reasonableness of the officer's belief as to the appropriate level of force[,]" which "should be judged from [the

---

[2] The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." Thus, "[t]o prevail on a Fourth Amendment excessive-force claim, a plaintiff must show [1] that a seizure occurred and [2] that it was unreasonable under the circumstances." *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (3d Cir. 2011). Here, there is no dispute that Plaintiff was "seized" given that he was shot and killed. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Thus, the only relevant consideration under the Fourth Amendment analysis is whether Defendants' exercise of deadly force was objectively reasonable.

8

officer's] on-scene perspective," and not in the "20/20 vision of hindsight." *Saucier*, 533 U.S. at 205 (internal citations and quotation marks omitted). "While this inquiry is highly individualized and fact specific," *Santini*, 795 F.3d at 417, the Supreme Court in *Graham v. Connor* prescribed three relevant factors to consider: (1) "the severity of the crime at issue," (2) "whether the suspect poses an imminent threat to the safety of the police or others in the vicinity," and (3) "whether the suspect attempts to resist arrest or flee the scene," 490 U.S. at 396.

The Court first considers "the severity of the crime at issue." *Id.* Here, the Parties agree that the crime at issue in this case was a burglary. It is likewise undisputed that the home subject to the burglary was abandoned and that Defendants knew as much prior to arriving to the scene. Defendants also concede that Plaintiff was unarmed prior to their struggle in the junkyard. Interestingly, Defendants appear to argue that—because they allegedly "were not aware" that Testa was unarmed when he came out of the house—the Court should imbue in them a belief that Testa was dangerous because he was engaged in an "inherently dangerous crime" (*i.e.*, burglary). *See* Defs.' Br. at 12–13. However, a measured view of the record does not lead the Court to conclude that the "severity of the crime" factor favors Defendants, particularly given that the burglary of an abandoned house is not "inherently dangerous." The authorities on which Defendants rely confirm as much. *See, e.g.*, *Richardson v. City of Newark*, No. 16-265, 2019 WL 2315013, at *4 (D.N.J. May 31, 2019) (addressing lethal use of force against fleeing suspect who attempted to break into a stranger's home), *aff'd*, 820 F. App'x 98, 100 (3d Cir. 2020) (citing officer's concern that "there could be a family inside"); *Deshotels v. Marshall*, 454 F. App'x 262, 264 (5th Cir. 2011) (assessing use of lethal force on report that "homeowner was restraining a man who broke into his house"). Thus, because the object of the burglary in this case was an indisputably abandoned and unoccupied house, the danger inherent in traditional burglary—namely that "the burglar might

9

confront a resident in the home after breaking and entering"—simply does not exist. *Johnson v. United States*, 576 U.S. 591, 596 (2015); *see also Gravely v. Speranza*, 219 F. App'x 213 (3d Cir. 2007) (finding objective reasonableness where suspect had committed "severe crimes," including "armed home invasion").[3]

      Moreover, even if the home were occupied, that alone would not conclude the inquiry. The Supreme Court has long recognized "[t]he fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous." *Tennessee v. Garner*, 471 U.S. 1, 21 (1985). Proper application of the Fourth Amendment's objective reasonableness standard requires looking at the "totality of the circumstances" and determining whether officers' actions "are objectively reasonable in light of the facts and circumstances confronting them[.]" *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999) (quoting *Garner*, 471 U.S. at 21) (internal quotation marks omitted). Thus, even "inherently dangerous" crimes are insufficient by themselves to support probable cause that a suspect is armed and dangerous. Here too, Defendants' cited authorities confirm as much. *See, e.g.*, *Richardson*, 2019 WL 2315013, at *1 (recounting testimony of officer that he "saw a bulge" in suspect's jacket, "grab[bed]" the bulge, and "knew immediately it was a handgun"). Construing all of these facts in the light most favorable to Plaintiff, and for the reasons stated above, a reasonable jury could find that the severity of the crime factor weighs in Testa's favor.

      The Court next turns to the second *Graham* factor—whether Testa posed "an imminent threat to the safety of the [Defendants] or others in the vicinity." 490 U.S. at 396. As an initial

---

[3] Lest there be any doubt, New Jersey courts interpreting the state's burglary statute have found that the burglary of an abandoned building—like the one in this case—simply does not present the same dangers as when, for example, "the burglary involved forcing a window of an occupied dwelling late at night to gain entry, placing the occupants at serious risk of harm." *State v. Robinson*, 673 A.2d 1372, 1379 (N.J. Super. Ct. App. Div. 1996) (contrasting the severity of occupied and unoccupied burglaries).

10

matter, the Court notes the Parties' apparent agreement that lethal force was not necessary to prevent Testa's escape and, by extension, harm to anyone in the vicinity. And for the reasons previously discussed, it can hardly be disputed that Testa did not pose any substantial or immediate threat to Defendants at any time prior to the struggle in the junkyard. Having duly considered the totality of the circumstances, the Court is left to assess the reasonableness of Defendants' actions "at the precise moment of the shooting." *Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016). Thus, the sole question is whether Defendants had "good reason" to believe that Testa posed "a significant threat of death or serious physical injury" to them. *Kelley v. O'Malley*, 787 F. App'x 102, 105 (3d Cir. 2019) (internal quotation marks omitted).

Although Defendants claim that they reasonably feared for their lives because "Testa grabbed a steel [pole] that was on the ground beneath him and tried to get up," Defs.' Br. at 15, the Court is mindful that the only other person who could contradict their story is Testa, who is obviously unable to testify. *See Abraham*, 183 F.3d at 294 (instructing courts to "be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify" (internal quotation marks omitted)). Without the benefit of Testa's testimony—or any other testimonial evidence—Plaintiff is constrained to "circumstantial evidence that, if believed, would tend to discredit the police officer's story" and considers "whether this evidence could convince a rational fact finder that the officer acted unreasonably." *Id.* (internal quotation marks omitted).

The Court finds that Plaintiff has presented evidence that calls into question whether Plaintiff ever possessed the pole at all, or posed the type of threat Defendants describe.[4] For

---

[4] However, even assuming that Plaintiff did grasp the pole, that alone "does not show that he posed a threat to the life and safety of the officers or other people when he was shot." *Kelley v. O'Malley*, 787 F. App'x 102, 105 (3d Cir. 2019).

11

example, Plaintiff's medical expert has opined that Testa could not have posed the type of threat Defendants claim because Testa must have been mentally disoriented or impaired due, in part, to the forceful blows delivered to his skull. Plaintiff has also proffered testimony from a law enforcement expert that likewise calls into question whether Defendants actually believed their lives were in peril given that Testa was outnumbered, outweighed, critically injured, and in a non-threatening position (*i.e.*, on the ground) at the time he is alleged to have been imminently dangerous. Plaintiff also points out that Testa had evidently never assaulted or attempted to assault Defendants; never threatened them verbally or physically; and was indeed never in a position to deliver the "imminent harm" Defendants purport to have feared. It is particularly probative that Testa never fought back even when Defendants were deploying an array of defensive techniques, including putting him in a headlock; delivering punches to his head, face, and abdomen; and striking him in the back of the head with a flashlight. And yet, throughout it all, Defendants' retelling of these events suggest that Testa was simply trying to get away.[5]

Although the objective reasonableness of an officer's use of force is typically a question of law, the Third Circuit has cautioned against making any such determination until after all material facts are no longer in dispute. To this end, courts may employ special jury interrogatories "to permit the jury to resolve the disputed facts upon which the court can then determine, as a matter of law, the ultimate question of qualified immunity." *Curley,* 499 F.3d at 279. Stated differently, "[w]hen the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, . . . but responsibility for answering that ultimate question remains with the court." *Id.* n.12.

---

[5] There is likewise no evidence that Testa ever deliberately sought out the pole, much less any other object, which is particularly telling in a vacant junkyard ostensibly filled with potential weapons.

Having considered the available evidence and the Parties' arguments, the Court cannot conclude at this time that Defendants' actions were objectively reasonable as a matter of law, particularly given the number of factual disputes created by the circumstantial evidence Plaintiff has raised.[6] In the time immediately preceding Testa's death, Defendants relate a scenario entirely different from that proffered by Plaintiff. Furthermore, Plaintiff has adduced sufficient evidence—by way of circumstantial evidence and expert testimony—which, if believed by a jury, would cast doubt on the reasonableness of Defendants' actions. Thus, the Court defers any further findings concerning Defendants' qualified immunity defense until after the jury has been presented with special interrogatories concerning what precisely occurred between Testa and Defendants in the junkyard. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *see also Bennett ex rel. Est. of Bennett v. Murphy*, 120 F. App'x 914, 918 (3d Cir. 2005) (observing "clearly established" rule that "[l]aw enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed" (internal quotation marks omitted) (alterations in original)).[7]

---

[6] Given this dispute, the Court need not reach the final *Graham* factor, for "it is possible for a finding that [Testa] was resisting arrest to coexist with a finding that the police used excessive force to subdue him." *Ramos-Ramirez v. Berwick Borough*, 819 F. App'x 103, 106 (3d Cir. 2020) (internal quotation marks omitted); *see also Nelson v. Jashurek*, 109 F.3d 142, 146 (3d Cir. 1997) (holding that a reasonable juror could find that the arrestee resisted arrest but was still subjected to excessive force).

[7] The Court also defers any further discussion of the "clearly established" prong of the qualified immunity analysis because Defendants may indeed have violated a clearly established constitutional right if the jury concludes that Testa did not pose an immediate threat to them. *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1 (1985). Moreover, the clear factual distinctions present on the face of the cases cited by Defendants underscore the necessity of a resolution of the disputed facts by a jury. *Compare Nelson v. Cnty. of Wright*, 162 F.3d 986, 991 (8th Cir. 1998) (holding that a reasonable officer could have believed that the use of potentially deadly force was reasonable where suspect had "reached for [deputy's] gun early in the struggle and that he also hit the deputy repeatedly, kicked him in the chest, and knocked him down twice, finally pushing him onto the floor of a closet") *with Woodward v. City of Tucson*, 870 F.3d 1154, 1157 (9th Cir. 2017) (finding qualified immunity warranted where screaming suspect charged at officer with a hockey stick raised over his shoulder in a swinging position "in a way that would allow him to strike at [the officer's] head").

Although the Court denies summary judgment at this time, Defendants are permitted to renew their Motion as to Plaintiff's excessive force claims at the appropriate time during or after trial.

### B. Plaintiff's Official Capacity Claims

Plaintiff's claims against Defendants in their official capacities under 42 U.S.C. § 1983 fail because Plaintiff has not demanded any prospective relief from them. Contrary to Defendants' argument that they are not "persons" within the meaning of the statute, individual persons may indeed by sued in their official capacities "[i]f prospective relief can be awarded against state officials under § 1983 and the State is the real party in interest in such suits." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 92 (1989). Here, even given the most liberal of readings, Plaintiff's Complaint makes no demand for prospective relief from either Defendant. Thus, Defendants' Motion for Summary Judgment on this point is granted.

### C. Plaintiff's Claim against Mueller for Failure to Intervene

The Court next considers Defendants' Motion with respect to Plaintiff's claim against Mueller for failing to intervene in Fallick's unconstitutional conduct. A police officer has a duty to "take reasonable steps to protect a victim from another officer's use of excessive force." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). However, where an officer is alleged to have participated in the constitutional violation, a plaintiff may not simultaneously assert a failure-to-intervene claim against that same officer. *See Mazur v. Twp. of Marlboro*, No. 3:16-CV-05527, 2020 WL 373343, at *5 (D.N.J. Jan. 23, 2020) (granting summary judgment on failure-to-intervene claim). This preclusion arises out of the common-sense observation that an officer "cannot intervene in his own constitutional violation." *Id.* (quoting *Flint v. Cty. of Milwaukee*, 91 F. Supp. 3d 1032, 1064 (E.D. Wis. 2015)) (internal quotation marks omitted).

At the outset, the Court notes that there is a significant degree of disconnect between the Parties' arguments and the specific constitutional violation Mueller is alleged to have both violated and failed to prevent. Defendants appear to seek summary judgment insofar as Mueller is alleged to have participated in the use of lethal force against Testa. However, Defendants' Motion only references allegations that both Fallick and Mueller had together deployed mace on Testa as they pursued him—allegations which would form an entirely separate excessive force claim. *See, e.g.*, *Warner v. Kuzob*, No. 05-CV-2871, 2009 WL 90385, at *1 (D.N.J. Jan. 12, 2009). Curiously, such a claim is not evidenced on the face of the Complaint. More befuddling is that Plaintiff's Opposition seemingly ignores the substance of Defendants' argument and instead addresses it as if they had indeed moved for summary judgment with respect to the lethal force. Any hope of either Party's arguments being redeemed or otherwise clarified was surely lost in Defendants' Reply, which makes no further mention of any failure-to-intervene claim, but rather appears to have surrendered their initial argument altogether.

In light of the foregoing, the Court declines to decipher or reconcile the Parties' arguments for them. To the extent Plaintiff asserts a claim for excessive force predicated on the application of mace, Defendants' Motion for Summary Judgment is granted for Plaintiff's apparent abandonment of that claim. Insofar as Defendant seeks summary judgment concerning Mueller's role in the use of lethal force, Defendants' Motion is denied at this juncture.

### D. **Plaintiff's State Law Claim**

Lastly, the Court addresses Plaintiff's state law claims against Defendants for wrongful death. The New Jersey Tort Claims Act ("NJTCA") governs tort claims against public employees. Similar to § 1983, the NJTCA also provides police officers with immunity from suit where they act "in good faith in the execution or enforcement of any law. N.J.S.A. § 59:3-3. However, this

15

immunity does not extend to public employees if their conduct "constituted a crime, actual fraud, actual malice, or willful misconduct." N.J.S.A. § 59:3–14(a).[8]

Here, Defendants correctly point out that "the same 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under [the NJTCA]." *Norman v. Haddon Twp.*, No. 1:14-CV-06034, 2017 WL 2812876, at *13 (D.N.J. June 29, 2017). Due to this symmetry, Defendants move for summary judgment on Plaintiff's state law claim for wrongful death by merely incorporating by reference the very same arguments they previously made in connection with their qualified immunity defense. Although Defendants are correct in their recitation of the law, they are incorrect in their prediction of where it leads. For the reasons articulated in Part IV(A), *infra*, Defendants' Motion for Summary Judgment on Plaintiff's state law claim is denied.

## V.     CONCLUSION

For all of the reasons articulated above, the Court grants Defendants' Motion for Summary Judgment, but only insofar as it concerns Plaintiff's failure-to-intervene claim against Mueller, as well as the purported excessive force claim regarding the use of mace. For all other claims, summary judgment is accordingly denied.

Dated: May 24, 2023

                                        */s/ Karen M. Williams*
                                        KAREN M. WILLIAMS
                                        United States District Judge

---

[8] Defendants have not moved for summary judgment with respect to any claim Plaintiff asserts in her individual capacity, including those under New Jersey's Wrongful Death Act, N.J.S.A. §§ 2A:31–1, –5 (enabling heirs of a person who has died by virtue of "a wrongful act, neglect or default" to assert claims for their "pecuniary injuries").